ANNA MELICKER, Appellee, v. JOHN SEDLACEK, SR., Appellant.

NEGLIGENCE: Non-Duty to Apprehend Unusual Occurrence. Even
1  though a person may, in a measure, know that his dog, of mature years, cherishes a lurking antipathy against a Ford automobile, yet such owner is under no legal obligation to apprehend that said dog, after wandering afield in the nighttime for a distance of 80 rods from home, may fall asleep upon a 2-foot bank bordering the public highway, and may feel displeased

when his rest is disturbed by the sudden approach of his arch enemy, and may express his displeasure by jumping into the roadway and hurling one "bark" at his disturber, and may thereupon be unceremoniously run over, with far greater resulting damages to the Ford and its occupants than to the dog. *Damnum absque injuria.*

ANIMALS: Collision with Dog in Highway. Evidence reviewed, and held insufficient to sustain a verdict for damages by reason of a collision with a dog in the public highway.

*Appeal from Johnson District Court.*—R. G. POPHAM, Judge.

OCTOBER 4, 1920.

ACTION to recover damages to the person of plaintiff and her husband, and to the Ford automobile of the latter, by reason of the automobile's striking a dog, alleged to have been owned or harbored by the defendant. The first count claimed damages for personal injuries to the plaintiff, and the second count for injuries to her husband and damages to his car, and alleged that her husband's cause of action had been assigned to her. Trial to a jury, which resulted in a verdict for plaintiff in the sum of $200, upon which judgment was rendered by the court. The defendant appeals.—*Reversed and remanded.*

*Hart & Hart,* for appellant.

*Dutcher, Davis & Hambrecht,* for appellee.

PRESTON, J.—The petition alleges, in substance, that defendant was the owner of, or harbored on his premises, a vicious dog; that the dog was in the habit of running out in the highway, and barking and biting at automobiles traveling thereon, and running in front thereof, greatly endangering the occupants of the car; that this fact was well known to defendant, prior to the

1. NEGLIGENCE: non-duty to apprehend unusual occurrence.

transaction in question, and that defendant made no effort to restrain the dog from continuing such practice, but continued to keep and harbor him; that, about 9:30 o'clock in the evening of October 27, 1918, plaintiff was riding along the highway near the premises of defendant, in a Ford car, belonging to and being driven by her husband; that, a short distance from the house of defendant, the dog jumped from the roadside in front of the car, and began barking and biting at the front wheel; that the dog so jumped in front of the car without warning to plaintiff, and ran directly in front of the car, and, through no fault of plaintiff or her husband, the front wheel of the car struck the dog, and caused the car to be thrown from the roadway into a ditch, and against an embankment, turning the car over; that plaintiff and her husband sustained injuries; that she was confined to her bed for a time, and was unable to do her ordinary work; that she suffered severe pain; that she was damaged in the sum of $50 for loss of time and inability to perform her usual labor, and incurred a doctor's bill of $50, and claims damages for pain and suffering by reason of the negligence of defendant. The second count describes her husband's injuries, and states that he lost 2 weeks' time, by which he was damaged in the sum of $25; that the car was broken and damaged in the sum of $173.75.

Defendant denied any responsibility; denied ownership of the dog; denied knowledge of its evil propensities, if any; and alleged that the injuries sustained, if any were sustained, were caused by the negligence of plaintiff and her husband.

There is no dispute as to some of the facts, and at other points there is a conflict. According to defendant's contention, on the night in question plaintiff and her husband drove out to visit her parents, passing defendant's farm. The night was dark and mist was falling as they started home, about 9:30 P. M. They had passed over this road earlier in the evening. The road was slippery, and, at the place of the accident, and for some distance in

either direction, had been recently worked, leaving clods
in the center. It was a narrow road, 25 to 30 feet wide,
winding, one fairly smooth track on the south side. The
road was made darker by reason of timber on the north
side of the road. The general direction of the road was
northwest and southeast. They were going west, or north-
west, at the rate of 12 or 15 miles an hour. The road was
slippery and rough,' out of the beaten path. The accident
happened at a point about 80 rods from defendant's home.
On the other hand, appellee contends that the evidence
does not show that the road was particularly winding, where
the accident occurred; that it is shown that, at the point
in question, the road bears to the northwest; that the
evidence does not show that the road was darkened by
trees, since plaintiff's husband testified that there was no
timber, where he hit the dog. They also claim that the
evidence shows it did not rain until after the accident,
and they deny that the road was slippery, and say that
the road had been worked, a month before, and that it was
a fairly well traveled road,—the main portion at the point
of the accident along the south side, and in a well beaten
track.· There is evidence that the traveled track was
pretty good, but that the road in the middle was rough.
There is evidence that, on the following morning, a witness
saw the track of plaintiff's car, where it crossed the road-
way diagonally, immediately before the accident. This,
too, is denied by other witnesses. The plaintiff's hus-
band testified, in regard to this:

"Q. Isn't it a fact that you were on the north side
of the road at that time, just before you turned to where
you had the accident? A. I cannot state; I don't remem-
ber. Q. You can't remember? Don't you know that you
were on the north side of the traveled section of that road,
and darted to the southwest, where you had the accident?
A. No, sir, I was driving on the south side of the road.
Q. Then why did you say—why did you just answer that
you couldn't say? A. I was driving on the south side
of the road when I hit the dog. Q. Will you swear to

this jury that you were not on the north side of that traveled track? A. I didn't cut across to the southwest, diagonally to the southwest, when I hit the dog. Q. Before you hit the dog? A. I cannot state to that. The road was graded up, and I don't know which side the track was on."

It is undisputed that plaintiff and her husband were driving at 12 to 15 miles an hour, and that it was about 9:30 P. M. As to the immediate transaction of the striking of the dog, plaintiff's husband says that the general direction of the road in front of defendant's house is northwest; that there is a bend in the way; that the general direction turns from the north to the west,—a bend; that, after passing his house, one goes west for a ways, and then there is a gradual bend to the northwest; that, as he passed defendant's house, he did not see the dog.

"First saw him 60 or 70 rods west of the house. We were driving along, and we got to the gate, and the dog jumped off the bank, 4 feet distant, and just barked, and we hit the dog with the front wheel of the car. There wasn't sufficient time to try to avoid striking the dog. The left front wheel struck the dog. When the wheel struck, it bent the steering bar on the right wheel, causing the car to run to the left, and up the bank. The front wheels were up on the bank, and the hind wheels in the road. When the right wheel hit the bank, it struck the front spring and upset the car, and we were both under."

After he got his wife out, he didn't see the dog, but heard him howling. The dog was lying in the road, and witness thought he had killed him, the way he was howling; then he started to move up the road east towards defendant's house. He says he saw the dog distinctly, so he could recognize him; that it was larger than a medium sized dog, dark brown on the back, yellow on the legs, white breast, 16, 18, or 20 inches high; that he lit a match, and could see that his wife was hurt,—she was bloody; that he took her to John Sedlacek's house, 3 blocks off the road, and sent for the doctor. He describes her injuries

and his, and the damage to the car. The next day, he went to defendant's home, and saw and conversed with him; saw the dog there in the yard, and recognized it as the same dog he struck; didn't examine the dog to see whether he was hurt or not. The dog was limping,—can't say which foot; thinks the left hind foot. He says defendant wanted to know how it happened; that he told him, and asked defendant what he was going to do about it; that defendant said he didn't know; that defendant said he wouldn't do anything about paying the damages; that defendant asked if witness knew it was that dog, and witness said he had seen the dog before, and it was, and that the dog had run out at him before; that the defendant admitted that the dog had run out at people, but not that far from the house. He said the dog belonged to his son; that he wouldn't stay at his son's house, and went back and forth, and stayed there with him. The dog had run out at witness as he passed there before, nearly every time he went by. He thinks the car went a rod or two, after he saw the dog, before the contact.

"He jumped in front and barked, and jumped in front of the front wheel, and I hit him with the front wheel, and the car ran over him. He lay there in the road afterwards. Q. Now, that is all the dog did, just as you testified here? A. Yes, sir. Q. And that was, that he barked at the front wheel, and after he did, you struck him with the automobile? A. Yes, sir. It turned the car to the left. Q. Now, when you saw the dog coming, what did you do, if anything? A. I didn't have a chance to do anything. I hit him so quick. Threw the clutch out, and put on the brake, and tried to stop, but there was no chance. The traveled road was all right up close to the bank. The wheel track was close to the bank, 2 feet or 3 from the bank. The bank was probably 4 feet high, and the dog was on that side of the road, on the south side of the car, and I was 2 feet from the edge of the bank. The bank was a bank sloping down, not straight up. The wheel didn't run over the dog; it hit him and threw him under the car.

I think just the middle part of the car ran over him. The dog still lay there, after I got out from under the car. After I got my wife out, I went to see the dog, and he was going up the road, squealing. That is the dog I saw at defendant's the next morning. Q. When the dog came towards you, you knew it was the Sedlacek dog? A. I wasn't quite sure. I thought it was his dog; I wasn't sure. His nephew told me it was his. I seen the dog just before I hit him. I got his description just before I hit him. Q. You tell this jury that you minutely examined this dog when he was coming at you and you were turning off the gas and throwing out the clutch and putting on the brakes, and that you took this dog's inventory and found that he was a brown dog, 18 or 20 inches tall, and had a white ring around his neck? A. No. I didn't. I say I seen the size and the color of the dog,—I couldn't just exactly tell. I seen him jump off the bank. Q. You didn't know then whether that was Sedlacek's dog or not, that jumped off the bank? A. No, only what his nephew told me. Q. That is all you did know about it then, what his nephew told you? A. No, I knew it was his dog; but to make sure, I asked him, and he told me. Q. Why did you ask him? A. I thought maybe it was somebody else's. I didn't see the dog there before he jumped out of the weeds off the bank. The next morning, defendant said that the dog was his son's, but that he stayed down at his place. John F. Sedlacek said that this dog belonged to his uncle John. There was nothing said about the dog running out at automobiles."

Mrs. Melicker, testifying with less detail, says she saw the dog.

"He just ran off the bank in front of the car, and that is all I saw. There was not much time between the time I saw the dog jump off the bank in front of the car before the car struck him. Didn't see the dog in the road after the accident. Heard him squealing. Had a moment's glance of him when he jumped down in front of the car. Noticed he was brown, with a white collar around his neck, and a

white breast. He ran off the bank and right toward the car, in front of the car. He started to bark, and then ran in front of the car, and that is all I saw. I have told all the dog did there at that time."

She also describes her injuries, and tells where they had been, where they were going, and so on. Another witness testifies to being with plaintiff's husband at defendant's home the next day. Says there was quite a conversation, but witness didn't remember much of it; didn't pay much attention. Defendant said he didn't think his dog would go out that far from the house. The dog was there. Says the dog was a medium dog, dark on the back, brown and white around the neck. Defendant said his dog wouldn't run that far from the house; said the dog would run out and bark at people in front of the house, but wouldn't go that far; said it was his son's dog, but the dog made his home there at the present time, at the defendant's house; says the dog ran out and barked at his front wheel twice that summer. Witness passed defendant's house eight or ten times during the two months. He thinks defendant's son Frank was present at the conversation. Another witness says that a dog, which he describes as a brownish dog, yellow back and white collar, a little white on his neck, came out twice, as he passed defendant's place; that he would come bouncing, as if he would chew the tire off the car; would follow for a rod or so, and, if you would speed up, he would slow up and go back.

"This was in the summer of 1918. We were out pleasure riding. I was going 12 or 15 miles an hour, and the dog couldn't catch me. I would be pretty far along, before the dog got to run out there. He wouldn't follow far."

This is the substance of plaintiff's testimony in regard to the transaction itself, although we have not attempted to go into any detail as to the injuries, damages, and so on.

Defendant testifies that, the next day after the accident, when plaintiff's husband came, his son and John F. were there. Witness examined the dog, to see if there were any wounds or sore spots, or whether the dog flinched. There

were none, and the dog didn't flinch or limp. He tells how, the dog came to be on his premises: that his brother-in-law rented his farm, and brought the dog with him; that the brother-in-law lived there about a year and a half, and moved to town, and a neighbor took the dog; that a hog bit the dog at the neighbor's, and he ran away, and went to another neighbor's, adjoining defendant's farm, and this dog came to his place; that defendant's son was to move on the neighbor's place, but, not having yet moved, was living with defendant.

"The dog, after staying a week or so at the neighbor's without anything to eat, came to my place. Don't know whether he followed us, or the other dogs that were with us. My son moved to the neighbor's place about the first of January. After my son moved, I took the dog over there and tied him up. After he kept coming back, I took a switch and switched him, trying to drive him back to where he used to stay; switched him 5 or 6 times. I did not have knowledge that this dog had the habit of running out after cars. Twice I saw him run out into the road and bark at an automobile. The last time was in the spring of 1918. Never saw him run out and snap at automobiles. The second time he ran out, I called him back and switched him. Since then, I have taken particular notice to see whether he went out, and I never saw him."

He denies the conversation testified to by Mr. Melicker, the next day, and gives his version of it; and says the dog might have been at his place for a little more than eight months before the accident; that, after witness switched the dog to make him go away, he wouldn't go, but after that, he stayed at defendant's place all the time; that he didn't feed him,—his folks did; that he has one dog there besides this one. He says he thought he had broken the dog of running out; that the dog has stayed at defendant's place since the accident; that some days, Sunday afternoons, there would be 25 cars pass by, and the dog paid no attention; that he knows this, of his positive knowledge.

Witness Dehner says he was at the place of the accident

about five minutes afterwards; that it was dark and a foggy night, misting heavily, more like rain; that it was impossible to see through the wind shield (last answer stricken on plaintiff's motion). He says he has passed defendant's place 75 or 100 times, during the year 1918; that he saw the brown and white dog in the yard; that the dog never ran out at the automobile of the witness.

"I am 46; my eyes are good; and I say it would be impossible to see more than two feet out in the dark that night, and see an object."

Another witness testifies to having passed defendant's place many times, 50 or 100, in 1918, and at none of these times did the dog ever run out or bark, or attempt to bite the car. He says he noticed the dog there in the yard; that other dogs had run out and barked at his automobile. Other witnesses gave similar testimony.

John F. Sedlacek denies telling Mr. Melicker that the dog was his uncle's. He says he examined the dog at defendant's house the next day, and that there were no bruises, and there was no flinching; that he made a careful, critical examination; that he has passed defendant's place 10 to 20 times a month, prior to the accident; that sometimes he saw the dog in the yard, and sometimes he would not; that the dog never came out to chase his automobile, and never followed him; that Melicker and wife came to the house of witness after the accident; that he went out with a lantern; that they had no light; that they told of the accident, mentioned the accident, and said the automobile ran into a little brown dog; that he examined the dog the next day, and there was nothing the matter with him.

Defendant's son Frank, 19 years of age, says he saw the dog examined the next day, and saw him walk and run, and there were no signs of lameness; that, in the conversation next day, Mr. Melicker complained of the road's being rough. Another witness says the road was rough, with sods in the middle; that, the next morning, he was at the place of the accident, and noticed where the automobile was sitting, and that the tracks came diagonally from the

north side of the road to the south side, across the rough part, over the sods; that the automobile had been turned back on its wheels; that he heard a conversation the next morning between someone who gave his name as Melicker, and another, Ellis, who lived at the county farm, where plaintiff and her husband lived, as follows:

"'This is Melicker talking.' He said he couldn't come back to work the next morning,—that he had an accident; and Ellis says, 'You better sell the damn thing,—that's not the first one you had.'"

He testifies further that there was a little bank on each side of the road at the place of the accident, and a small depression each side of the roadway, for the water to run,— a good track on each side of the road, one side as good as the other; that he could see no reason why a man driving along there should cross over to the other side; that the track going across there went up to the automobile, and didn't go any farther.

Another witness says that the dog in question was more than 12 years old; that he has known him that long; that, 12 years ago, the dog was at Dvorsky's (his neighbor across the road, who is the neighbor referred to by defendant); that, during the 12 years he has known the dog, he never saw him run out at automobiles; that he barks, and that is about all; that he never saw him outside the house yard; that he lives about a mile and a half from defendant.

In rebuttal, Mr. Melicker denies the phone conversation, and denies crossing the road diagonally.

By the errors assigned, the defendant challenges the sufficiency of the evidence to sustain the verdict, and claims that the court erred in not sustaining the motion to direct a verdict for defendant at the close of plaintiff's testimony, and of all the testimony; that the court erred in admitting and excluding evidence; and erred in refusing instructions asked by the defendant, and in the instructions given.

1. Appellant argues at some length that he is not liable under Section 2340 of the Code. They cite *Brown v. Moyer*, 186 Iowa 1322, and other cases, to sustain their position

that, to authorize a recovery under the statute, it must be shown that the dog was worrying, maiming, or killing a domestic animal, or that it was attacking or attempting to bite a person. Counsel state in argument that the purpose of arguing that the case is not within the statute, is that there is no statement in the record by appellee that they are not claiming under the statute, and that they, therefore, argue the question, lest it may be presented by appellee. There is no evidence in the record to show that the dog in question was doing any of the things enumerated in the statute. It will not be necessary to consider this question, because appellee says that the plaintiff is not claiming under the statute, but that a recovery is sought under the common-law rule; that there is no claim that the dog in question attacked or attempted to bite a person. Appellee contends that the owner, or one who harbors a vicious dog, is liable for the injuries committed by it, and that the liability is imposed, not because of ownership, but because of possession, and the duty to care for the animal. They cite *Alexander v. Crosby,* 143 Iowa 50; *Marsel v. Bowman,* 62 Iowa 57; *Sanders v. O'Callaghan,* 111 Iowa 574. Appellee concedes that it is the law in this state that, at common law, the owner of the dog cannot be held responsible for the acts of the dog, unless it was made to appear that the dog was vicious, and that the owner had either actual or constructive notice of its vicious propensities. *Brown v. Moyer,* 186 Iowa 1322. They further contend that the common-law rule is changed by the statute in two particulars, namely, that it makes the owner alone responsible, and dispenses with proof of *scienter;* and that, in this action, it is immaterial whether the defendant was the owner or harborer of the dog, his liability remains the same; and that the difference is the question of *scienter,* which, they contend, has been established by the evidence.

2. The dog in question had a right in the highway, unless it was a vicious dog, within the meaning of the law; and in that case, he would be a nuisance, or perhaps there would be negligence in failing to restrain him; and if the

defendant, as the owner or harborer, had knowledge of its vicious propensities, and plaintiff was injured because of such viciousness, defendant would be liable, unless, perhaps, he was excused by the fault of the plaintiff. *Brown v. Moyer*, 186 Iowa 1322; *Alexander v. Crosby*, 143 Iowa 50, 52. If the dog was not a vicious dog, it follows, of course, that defendant could have no knowledge thereof. Was the dog a vicious dog? Plaintiff's evidence shows that, about four times during the summer, the dog ran out from defendant's yard into the highway, and barked, or chased automobiles, and, on one occasion, attempted to bite the wheel. There is not a word of evidence in the entire record that the dog ever attacked or attempted to bite any person or any domestic animal. On the other hand, a number of witnesses testify to having passed the place hundreds of times, and that the dog did nothing. On the occasion in question, plaintiff's husband testifies in greater detail as to what the dog did, and says:

"He just jumped off the bank about four feet from me, and just as he barked, I hit him with the front wheel on the inside."

And again:

"Q. Now that is all the dog did, just as you testified here? A. Yes, sir. Q. And that was, that he barked at the front wheel, and after he did, you struck him with the automobile? A. Yes, sir."

The wife testifies:

"He started to bark, and then ran in front of the car, and that is all I saw."

This is the sum and substance of it all. Appellee says in argument:

"If a person has a dog in his possession for a considerable length of time, and such dog has, all that time, been in the habit of rushing into the highway, in front of the owner's residence, and of barking at, chasing, or worrying or attacking a passing team, in a ferocious manner, a question is presented to the jury to find whether the owner was aware of such habit," etc.

And again:

"It is immaterial whether the dog was attacking a person, or some other animal, the liability for the damages remains the same."

But it does not appear that this animal was attacking any person or animal, or chasing or worrying or attacking passing teams, in a ferocious manner. An animal, a horse or team, for instance, might be frightened by a dog running at or biting it. Not so with an automobile. Most of the cases are where there was an attack of some kind by worrying or biting, or the appearance of a ferocious attack, and we assume it is for that reason that the definitions for "vicious," or "vicious animal," are not plentiful. One naturally gets the idea that there is an element of savagery or fierceness, ferociousness, or mischievousness, as in worrying other animals, as a sheep-worrying dog, etc. In 40 Cyc. 203, note, it is said, quoting from a Georgia case, that:

"A vicious animal is any individual of a vicious species, or a vicious individual of a harmless species."

And at the same page, it is said that a vicious propensity is not confined to a disposition on the part of a dog to attack every person he might meet, but includes, as well, a natural fierceness or disposition for mischievousness, such as might occasionally lead him to attack human beings without provocation. In 2 Cyc. 415, it is said that one may kill a vicious animal in necessary defense of himself or the members of his household, or under circumstances which indicate danger that property will be injured or destroyed, unless the aggressor is killed; but it seems that such a killing is justified only where the animal is actually doing injury. See, also, *Marshall v. Blackshire,* 44 Iowa 475. The right to kill is, of course, controlled by the statute, more or less; but we are speaking now only of the meaning of the word "vicious." In *Merrit v. Matchett,* 135 Mo. App. 176 (115 S. W. 1066), an instruction was approved in this form:

"The jury are instructed that what is meant by the term 'a vicious propensity' in an animal is such a propensity that

the dog might attack or injure the safety of persons without being provoked so to do."

In 3 Corpus Juris 104, it is said that, under the common law, it is incumbent on one complaining of the savage act of a dog to prove its vicious propensity, etc. In *Sanders v. Teape,* 51 L. T. Rep. (N. S.) 263, cited in note at page 99 in 3 Corpus Juris, where a dog playing in a garden jumped over a wall and struck plaintiff, who was digging a hole, it was held that the owner of the dog was not liable. 3 Corpus Juris 104, in note citing *Briscoe v. Alfrey,* 61 Ark. 196 (30 L. R. A. 607), and other cases, states that:

"The vicious dog in general, and the odious sheep killer in particular, are under the law's especial condemnation."

In 1 Ruling Case Law 1116, we find:

"But a cross and savage disposition on the part of a dog is not necessary in order to impose liability on its owner for its assault; he is equally responsible where it appears that the dog had a propensity to bite only in play, if he knew of such mischievous habit, and injury results."

And at page 1117:

"Also, if a dog is not always dangerous, but is likely, as its owner knows, to bite either man or beast only at particular seasons, or under particular circumstances, then, against those seasons and circumstances, and that kind of mischief to be apprehended in them, the owner insures at his peril."

The same thought is carried into the statute, Section 2340, making it lawful for any person to kill a dog caught in the act of worrying or killing domestic animals, or attacking or attempting to bite persons, and so on. Clearly, the accident in this case was not caused by any vicious act on the part of the dog. At most, he simply barked at the machine, and jumped down from the bank. He may have been, and doubtless was, at that time of night, asleep on the top of the bank, and surprised, provoked, by the approach of the auto close to him, then jumped down and

2. ANIMALS: collision with dog in highway.

barked. These circumstances were somewhat different from those testified to by plaintiff's two witnesses, about the dog's running out from the yard, and, it seems to us, so different that, even though defendant should be held to have had notice of what the dog had done before, it would not be notice of the alleged vicious propensity of the dog at the time in question, or put the defendant on his guard, and require him, as an ordinarily prudent person, to anticipate the injury which did happen. 3 Corpus Juris 96. In the note to the citation given, it is said that, under such circumstances, it is not enough to show constructive knowledge, but that it must be actual knowledge, particularly in the absence of proof that the animal was of a savage and ferocious nature. In 3 Corpus Juris 92, Section 321, it is said:

"It may be necessary further to take into consideration the question whether the act complained of is one which the owner could or could not have anticipated."

See, also, same volume, page 95, Section 326. See, also, *Malony v. Bishop & Bridge,* (Iowa,) 105 N. W. 407 (not officially reported).

And in 1 Ruling Case Law 1117, on the question of *scienter,* it is said that knowledge that a dog is ferociously disposed toward cattle is, ordinarily, not notice that it will attack persons, and that, under the modern doctrine, it is sufficient to show that the animal would be likely to commit an injury similar to the one complained of. Many cases are cited by appellant on the question of *scienter,* but, in view of what we have said, we deem it unnecessary to discuss that question further. It should be said in this connection that there is a suggestion, in the testimony of plaintiff or her husband, which is in the nature of a conclusion, that the dog came from the cornfield at the side of the road; but neither testifies that they saw that; but, on the contrary, both say that, the first they saw of the dog, he was on the bank. The dog did not run into the automobile, but, on the contrary, the automobile ran into the dog. The same result would have happened if the dog was not vicious, or if

it had been a sheep or a hog. At any rate, the theory upon which the case was tried was along the lines we have suggested, as to the vicious character. The court instructed along that line in three or four instructions. In Instruction 5, the court said:

"5. It is the law of this state that, if a person owns or harbors a vicious dog at his place which he permits to run at large and on the public highway near his place, and that he knows or should have known, by the exercise of reasonable care, that said dog was vicious and likely to attack and injure persons while passing along said highway, then and in that event the person who owns or harbors said vicious dog is liable for the injuries committed by it."

Again, in the same instruction, the court placed the burden of proof upon plaintiff to show that defendant "knew, or should have known, by the exercise of reasonable care, that said dog was vicious and likely to attack and injure persons, while passing along the said public highway, and that the dog did attack the car in which plaintiff was riding," and so on. The same thought is in some of the other instructions. There is no evidence that the dog did attack the car. There is no evidence in the record to show, or from which defendant had or should have had knowledge, that this dog was likely to attack and injure persons while passing along the highway. The instruction is the law of the case, and the plaintiff did not establish by evidence matters which she was required to show, under the instructions. And this is so, even though it be argued that the trial court placed a greater burden upon plaintiff than should have been done. Appellant makes the further complaint of the instructions just referred to that it is error to instruct on matter not pleaded, or on which there is no evidence. They cite *Zellmer v. McTaigue,* 170 Iowa 534, 538.

Furthermore, the jury may have reasoned that the court thought, and intended to intimate, that, because plaintiff's evidence showed that, on a few occasions, the dog had run out and chased automobiles, it was likely to attack persons. As said, there was no evidence that the dog had ever

attacked any person or domestic animal. It is clear that it cannot be said from the evidence that this dog was in the habit of doing what he did. We hold that, under the record, the dog was not a vicious dog, within the meaning of the law, and that the evidence does not support the verdict, under the evidence and the law, and under the instructions given by the court. It seems to us that, if a recovery is warranted here, nearly every farmer in Iowa who owns a shepherd dog would be liable several times a year. We may say, in passing, that it is a close question whether plaintiff and her husband were able, under the circumstances, to identify the dog as the dog kept by defendant. Possibly this was a question for the jury, and we do not determine the question. It is claimed by appellant that plaintiff's husband drove the car across the road at the dog, and for this reason, and because of the speed of the car on a road that was rough in the middle and the other circumstances, plaintiff and her husband were guilty of contributory negligence. It occurs to us that there is force in some of these suggestions, but there was a conflict in regard to some of these matters, and they were for the jury.

Other questions are argued, some of which are in regard to rulings on evidence, offered instructions, and so on, which are not likely to occur on a retrial of the case, if there should be another trial. As to some of the other questions, it is unnecessary to determine, in the view we take of the case. For the reasons given, the cause is—*Reversed and remanded.*

EVANS, STEVENS, and SALINGER, JJ., concur.

WEAVER, C. J., LADD and ARTHUR, JJ., dissent.